I'm Theodore J. Boutrous, Jr., representing the appellants. Today I'd like to focus on three main points. First, this case should be dismissed for lack of subject matter jurisdiction, and the findings and judgment below should be vacated. Second, even if there were subject matter jurisdiction, the district court committed legal error by invalidating, as an unlawful penalty, the $3.8 million fee that we submit was expressly authorized by Section 99050 of the Nevada Revised Statutes. And finally, at a bare minimum, the court should reverse the district court's finding as legally erroneous regarding successor liability. Let me begin with the jurisdictional point, because that's the threshold for this court to first confront whether the district court had jurisdiction and whether this court has jurisdiction. We believe that the answer is no. The case below involved a purely State law dispute between Nevada residents over a commercial real estate loan that was heavily collateralized. The promissory note that was issued as part of the loan transaction was not a security, and I think that's made clear by this Court's decisions, dating back at least to the mid-1970s, by decisions from the U.S. Supreme Court, by other circuits, and by the district court's ultimate ruling in this case, which is on page 444 of our excerpts of record, where the district court said that he was unable to find any case where a borrower in a commercial loan transaction had been able to bring a securities claim based on the loan transaction itself, and that if any transact anyone had a claim, it might be the investors who purchased later the secondary fractionalized interests that were sold and bundled together as separate instruments. In addition, the plaintiffs in this case, the plaintiff, Desert Land, did not have standing as a purchaser or seller of a security. It borrowed money from first DMMI and then Veston Mortgage Company so that it could purchase property. And under the Reeves family resemblance test, that transaction bears an exceedingly close resemblance to a mortgage on a home. They needed money to buy property. They came to my clients and borrowed that money, and then the loans were secured by deeds of trust, essentially like a mortgage, that gave security on that property. Accordingly, because the plaintiffs had no standing to bring a 10b-5 claim or any Federal securities claim, and because the fundamental jurisdictional fact of the existence of a security were not present in this case, there was no Federal jurisdiction. And as this Court held in the Herman family revocable trust case, because there was not a hook for Federal jurisdiction to begin with, there was no jurisdiction over the 17 supplemental claims, including the supplemental the one claim upon which the district judge found in favor of Desert Land, the plaintiff. One of the issues I wanted to address is the question of the substantiality test and how it plays into this case. The our position is that with respect to a jurisdictional fact, whether or not there was an arguable basis that this was a security, because it is a jurisdictional fact, it's a threshold inquiry, and the Supreme Court held this in the United Housing Foundation case. This Court has held it in other cases that we've cited, including the United Sports Fisher case and the AmFac case. At the end of the day, if a court finds that there is not a security in this case, there is no Federal jurisdiction and there was no Federal jurisdiction, so it is improper to maintain jurisdiction over the supplemental claims. That said, under the substantiality test, which I think applies to a situation where there is clearly someone has articulated a claim that falls within the ambit of Federal jurisdiction, as in Hagen's, that there was an equal protection claim, the individual clearly had standing to assert an equal protection violation as a citizen, and clearly one, it was proper to argue that certain statutes gave equal and unequal treatment in a rational way. So the threshold had been reached, but the argument was that those claims, the equal protection claims, were so flimsy and so weak on the merits that even that assertion of an equal protection claim did not give jurisdiction. That's a different issue than we have here, because our facts go directly to Federal jurisdiction. So we believe that there was no Federal jurisdiction in this case on that ground that the Court should dismiss and vacate the findings and judgment below. If the Court were to determine that there was jurisdiction, we would ask the Court to reverse on the merits of the unlawful penalty holding. Kennedy. Your position is that if the contract said instead of a fee of $5 million, if it said there shall be a penalty of $5 million, that would be valid also? Yes, Your Honor. I think the label would not matter in this context. The statute, section 99050 of the Nevada ROI statute, says any fee or charge. And this was a penalty as a fee. I'm not only saying the label, but if in fact it is a penalty and it's labeled a penalty, both, that's also, in your view, permitted under the statute. Under this statute, Your Honor, I believe that late penalties, in fact, the statute that we're dealing with, section 99050, was enacted as part of an effort to authorize credit card companies and other lenders. Well, it wouldn't only have to be a late penalty. I mean, it could be a penalty for any reason would be valid under your theory. Only in a contract for money due or owed, essentially a loan contract like we have here, including commercial loans like we have. The statute is limited to that context. And the plaintiffs argue that that was meant to only apply to consumer credit card transactions, and I think that is clearly incorrect. The statute says, is broadly worded. And I don't think that the Nevada legislature meant to hold, allow any penalty at all to be imposed or fee to be imposed against consumers, but not to sophisticated business people like Mr. Bullock in Desert Land in this case. So I think that the language is very clear. And we believe that it was incorrect for the Court to find that this $3.8 million fee was an unlawful penalty and against public policy, because the only source of policy that anyone has pointed to is this Nevada statute that authorizes these fees, charges in the context of loan agreements. And the one case from the Nevada Supreme Court that anyone has found is this consumer distributors case, which involved rental penalties and fees in connection with a rental agreement that were due and owing for holdover rent. And the Nevada Supreme Court said that even though it was harsh, since it was entered into at arm's length, it could not be challenged as unfair under the step, because of the statute. So we believe that under that statute, it was error for the district judge to find this was an unfair penalty. Now, really, the Court's analysis, the district judge did not point to any other sources. In Nevada law, a policy against fees or penalties or however they are labeled in the loan context. And in the transaction here, this was an arm's length negotiation, and it was in the context of Mr. Bullock wanting to obtain another loan from Veston after he had obtained a loan from DMLI, the related company. And Mr. Bullock and his company drafted the ultimate agreement in February 2000 regarding the $3.8 million penalty. One of his staff members said that they found that amount acceptable in order to get the additional funding. And then after the transaction closed, within a week, in August 30, 1999, Mr. Bullock sent a thank-you letter to Mr. Schustek and his company, my clients, thanking them for doing what no other lender could have done, made this financing happen. That's Exhibit 126. So for all those reasons, we believe the Court should reverse on the merits if it finds that there is jurisdiction. Finally, with respect to the question of the successor liability, as I said at the outset, at a bare minimum, we respectfully request that the Court vacate that finding. As this Court is aware, and as the Nevada Supreme Court said most recently in the Village Builders case that Desert Land submitted to the Court in its 28J letter, successor liability is the exception to the rule. And Nevada, it presumes that the corporate form will be respected. And here, the plaintiffs did not argue successor liability during the trial, and instead argued alter ego, and the district judge rejected the alter ego claim, found that there was no improper conduct amongst the corporations, there's no allegation that the corporate identity had any unfair effect with respect to the plaintiffs, and the district judge found there was no fraud claim that was viable in any of this. And here, the successor liability claim doesn't hang together as a matter of logic or law, because DMMI, the company to whom the fee of $3.8 million was owed and who received the fee, continues in existence to this day. It sold certain assets to Veston in April of 1999 before the contract ever came into existence relating to the $3.8 million fee, and before any liability had been incurred. So as a matter of fact, it would have been impossible for Veston to have assumed or incurred or taken over those liabilities from the company because they hadn't come into existence at the time of the transaction. What I was reading what the district judge was saying, I was finding, the district judge said, basically, I want whoever got the penalty to pay it back. So what happened? I mean, where did the penalty go? The penalty, the record reflects that the penalty went to DMMI, and the Plaintiffs' Counsel said that to the judge in that hearing, I believe, Judge Rustani, that you're referring to on that very page, that the record wasn't clear on this point. And the Plaintiffs, I think on page 50 of their brief in this Court, said, again, it wasn't clear on this point. It was the Plaintiffs' burden to prove that some other company got the money and that there was some successor liability. I think that's the case. Even after counsel stands up and he says, well, who's the successor, and counsel says Veston. I mean, it sounds as if at that point, why would plaintiff think it has to do more? Well, I think there the judge was talking about the, you know, this point about, you know, who the companies are. But the, I think, Plaintiffs' Counsel said, well, we'll work it out, we'll talk about it, and then submitted these findings, which we objected to. But I think counsel's statement during the hearing was meant simply to reflect the fact that Veston had succeeded to some of the mortgage assets and some of the assets of the DMMI company. But in a legal sense, there was no evidence that it had succeeded to this obligation or this liability. And that goes for the 10-K statement as well, which was not submitted to the trial judge before his judgment, but mentions that the company succeeded to some of the assets, but not, I think, somewhere in the record, I think a letter from the general counsel says that Veston succeeded to the mortgage assets, but not the liabilities or stocks of DMMI. So even if in a colloquial way or in some fashion Veston was a successor to portions of the business, that's not enough under successor liability, which requires that the company, that there only be one company left standing or that the liabilities were transferred in and some unfairness would occur absent a finding of successor liability, which did not happen here. I will reserve the rest of my time. Thank you, Your Honor. Thank you, counsel. May it please the Court, my name is Keith Rooker. It's a privilege to appear before this panel today, and it's a privilege to have with me Professor Vikram Amar, who teaches federal courts like I used to teach federal courts. The other side had Arthur Miller. Who was it today who said, well, not everybody has to go to Harvard, Stanford's all right? It was somebody in the newspaper today who was. I hope not. I hope not, Your Honor, because I didn't go to one of those schools. I went to Chicago. Well, nobody said anything about Chicago. Oh, it's a small school. It was someone from Stanford who felt a little insecure about all the justices on the Supreme Court from Harvard. But anyway, we'll treat Professor Amar the same as Professor Miller. I think that's appropriate, Your Honor. And we will talk about Professor Miller's comments in his treatise in the course of our discussion here today. This case arises from a course of dealing that involves seriously misleading conduct and raw and abusive exercise of economic power by the appellants. Let me review briefly the preliminary facts. Desert Land borrowed $13 million through appellants in 1998. That was the Blue Diamond loan. The record also shows it called the Imperial loan. This loan was syndicated to a large number of ordinary members of the public who were investors. Mr. Schustek's affidavit proffered in opposition to a motion for summary judgment in support of his motion for summary judgment describes his concerns about making the airport loan, which was the second loan in 1999. And I quote from his affidavit, I was concerned that unless the Blue Diamond was paid off, I would have a borrow worth almost $50 million of investors' money in speculative ventures without a track record of repayment to provide a level of comfort to my The appellants didn't invest a dime in these loans. 100% of the money the record reflects came from investors. When did it come from investors? I invite the Court's attention to tabs 18 to 35 of the supplemental excerpts of record, which demonstrate that over 600 investors put up the $34.5 million for the airport loan. Those are the notes that are at issue here as to whether they're securities or not. Almost all between the time the commitment letter was signed on August 5th of 1999 and before the loan funded on August 26th of 1999. And that handful who put it up later, it was very shortly thereafter. The district court clearly understood what Mr. Schustek said in his affidavit, and I quote, I told him, meaning Mr. Bullock, Elmar would be interested in raising the money. District court clearly understood appellants never loaned their own money to Desertland. They raised the money from investors by distributing fractional interest in the notes and deeds of trust. In fact, the notes were doubled down. There was one note for $34.5 million and then a series of six notes broken down to facilitate the distribution. Public distribution was the normal, ordinary, and intended course of business by appellants, and it was the course of business intended to be followed that was followed with respect to both the Blue Diamond loan and the airport loan. Now, this Court is familiar with securities transactions. The Court knows that a company that issues stock is called an issuer. The broker who places that stock with the public is called an underwriter. Under the securities laws, an underwriter is defined as an organization that acquires the securities from the issuer with a view to distribution thereof to the public. The investors are the members of the public who ultimately buy it. These are simple principles. There is no question that with respect to both of these transactions, Desertland was the issuer of the note. There is no question that the appellants were the underwriters of the note who distributed them to the public, as was intended. There is no question these notes were securities. The notes were signed and bore interest from and after August 16th of 1999. I again invite the Court's attention to those tabs 18 to 35 of the supplemental excerpts of record. The airport loan commitment was signed on August 5th. It says nothing about any prepayment of the Blue Diamond loan, which already was in place. The notes were signed on August 16th. They say nothing about any prepayment of the Blue Diamond loan, which was already in place. Three days before the loan was funded, after, as Judge Mahan found in his findings, Desertland had abandoned other potential lending sources in favor of getting this deal closed, and at a time when if they did not bow to Mr. Schustek's demands, they would lose the whole airport assemblage opportunity that they had, Mr. Schustek says, you will make a $4.5 million prepayment of the $13 million Blue Diamond loan within 48 hours after the airport loan closes, or there will be a $10 million penalty. And if you manage to make that one, you will make a $3.5 million prepayment within 100 business days, or there will be a $5 million penalty. Freely negotiated, counsel tells that to the court. I invite your attention to the court's findings. At tab 35 of the excerpts of record, Judge Mahan explicitly found that the economic leverage that was imposed by the appellants left Desertland no alternative. They did manage to make that first $4.5 million deduction and avoided the $10 million penalty. They were not able to make the $3.5 million prepayment, even though the loan wasn't due yet under its terms within the 100 days, and so the $5 million penalty was negotiated, was demanded, and then was negotiated down to $3.8 million and paid. Now, what is the simple essence of the securities claim that Desertland asserted in this case? It was that appellants entered into the loan commitment on the airport loan on August 5th and took the notes on August 16th and concealed their intent to impose this penalty on the preexisting loan. Then and at the time, the notes were fractionalized and distributed to the public. Not later, as counsel says, but at the same time. So why does that give you standing to bring a securities claim? Because the issuer of a security is a seller. But the issuer did not sell to you, to your client. Our client is the issuer, Your Honor, just like the corporation is the issuer of the stock. The corporation sells the stock to the investment banker. I understand the analogy, but I don't think that it necessarily works in this context, because you have a sale of a fractionalized interest and a note is somewhat different from the sale of a fractionalized interest in stock. This Court explicitly held that this arrangement constitutes a security in the Wallenberg case. The Second Circuit so held in the Pollack case. Who has the claim? In each of those cases, the claim was asserted by the investor. That doesn't change the character of the transaction, Your Honor. It may not, but it may raise some standing questions. And we can talk about that, Your Honor. There is the first point to be made on that is that the issue of standing under the Birnbaum case in the Second Circuit and under the Blue Chip Stamp case of the Supreme Court is not an Article III standing issue. It is standing that is associated with proof of one of the elements of the offenses under the 34 Act. That law is clear. It is an intensely factual inquiry and is almost never resolved and was not resolved in those cases at the threshold of the case. Well, the paradigmatic case of securities fraud is when there is a misrepresentation to the investor. And here you are not asserting any misrepresentations to the investor. No, we're asserting a misrepresentation to the issuer, Your Honor. It is as if the investment banker said to the corporation issuing the stock, we will do this deal for a 1 percent fee, underwriting fee. And then after the deal has been marketed and when they're ready to close, the banker says, oh, by the way, the fee is 5 percent. And the evidence is, the allegation is and the evidence is that the broker intended that from the beginning and made a misrepresentation to the issuer. That's an actionable misrepresentation made to the issuer, and this Court in the Rochelle case affirmed the standing of an issuer to assert a securities fraud claim in a context of that kind. Now, the proper framing of the jurisdictional issue in this case is really straightforward. And is mandated by 55 years of jurisprudence found in the decisions of this Court consistent with the binding decisions of the Supreme Court. Was the securities fraud claim pleaded in Desertland's complaint sufficient to invoke the Article III power of the District Court? Or to frame the question in the language of the decided cases, was that claim so, quote, absolutely devoid of merit, wholly insubstantial, obviously frivolous, plainly insubstantial and no longer open to discussion, that language is from Hagen's against Levine, which followed Bell v. Hood in 1946 case, and which was reaffirmed in Steel Company, Justice Scalia's opinion in 1989, that the District Court simply never had subject matter jurisdiction over the action. As Professor Miller correctly states in his treatise, not in the briefs filed here, a jurisdictionally substantial, quote, if there is any foundation of plausibility to the claim. This Court has adopted and applied this rule in multiple contexts, including the securities fraud context. We've cited to the Court primarily the Wallenberg case decided in 2002. And we cite to the Court the same case that appellants cite to the Court, the Herman Family case. That's an admiralty case. In that case, written by the same judge who wrote the Wallenberg opinion, Judge McEwen, two opinions are only a year apart. Judge McEwen says, admiralty jurisdiction never existed because a dispute over the sale of a vessel does not invoke admiralty jurisdiction. She goes on to distinguish the situation that she faced in Wallenberg by saying, in the Herman Family case, a suit arising out of the sale of a vessel does not give rise to admiralty jurisdiction. That's one case. And then she talks about the Wallenberg case or this case, which entails, quote, the District Court's discretionary authority to retain jurisdiction over State law claims where it has dismissed on the merits Federal claims over which it did have original jurisdiction. In the Wallenberg case, Judge McEwen said this. Although Wallenberg, referring to the defendant, frames the issue as one of the District Court's subject matter jurisdiction, because the question of whether the case involved a security was itself a Federal question, the District Court had subject matter jurisdiction. Now, viewed in the light of the authoritative pronouncements of this Court about the jurisdictional dismissals, as they bear on the discretion of the District Court to retain jurisdiction and decide State law claims, whether under pre-1367 law or that law as codified in 28 U.S.C. 1367, appellant's position is just plainly untenable. In fact, the extreme incompatibility of appellant's position with the settled law on the basis of the District Court's discretionary authority to retain jurisdiction  In the light of this appeal at the threshold, it is essential to understand what the District Court did and did not do. First, I invite this Court to read the complaint in this case. It is at excerpts of Record I. We submit the Court will find that in every respect it satisfies the requirement of a well-pleaded securities fraud claim. Chief Judge Proe denied a motion to dismiss that raised all of the jurisdictional and securities arguments made here. He denied a motion for reconsideration that raised all of those issues. The trial judge, Judge Mahan, then a deeply experienced State court judge who had recently been appointed to the Federal bench, denied a motion for summary judgment made after the close of all discovery that again raised all the jurisdictional and securities arguments here made by the appellants. In denying the motion, Judge Mahan made this broad observation. The plaintiffs have presented novel arguments in support of their position, but in looking at it, it seems to me that there is a Federal securities claim here, excuse me, there, and whether it has any merit, I don't know. That's nine excerpts of Record, pages 156, 57. After six days of trial and after the parties had rested their cases, Judge Mahan did four things and only four things. First, he ruled that the Court had jurisdiction over the securities fraud claim. Second, he exercised his discretion as part of that ruling. He ruled that, and I quote, plaintiffs have not established liability of defendant, any defendant in connection with the Federal securities claim. He didn't say there was no security. He didn't say there was no standing. He simply said liability had not been established. Third, he noted in his oral ruling, not in his findings, that this Court in Wallenbrook had held that the notes were securities. Then he referred to the fact that the plaintiffs in that case were investors, and he thought that if there was a claim, it would belong to the investors and not to the borrower. That court, that incidentally is clearly incorrect if it constitutes a statement of the law that an issuer does not have a securities fraud claim as a matter of law, because this Court so held in Rochelle v. Marine Midland. And finally, he found that there was no fraud, fraudulent inducement, negligent misrepresentation, or breach. This last observation we submit is the most accurate explanation for the district court's denial of securities fraud liability. The elements of fraud, he found, were not proven. Was it scienter? Was it representation? Was it reliance? He doesn't say. But what appellants seek to do is invite this Court to overrule the whole body of law since Bell v. Hood and say that a dismissal on the merits made after six days of trial where the district court simply concludes the Federal claim is not proven is a jurisdictional dismissal. Well, actually, I think you've misstated their case. Their case is that he was, the Court erred from the outset in not finding a jurisdictional defect, not, that's what he's arguing. So I think you've misstated his argument. Well, he's, they've given no attention to what Judge Proulx did or what Judge Mahan did on the summary judgment ruling. So I, with all due respect, Judge Rustani, I think you may be given, giving the appellants more credit than they are due. Let me turn now briefly to the successor liability issue. The appellants have discarded the Village Builders case as really immaterial to this case. I invite the Court's attention to the statements in Village Builders about what must be proven continuation of the business assumption of the liabilities associated with the ordinary operation of the business and the continuity of ownership. Those are all established in the record, and under Village Builders, successor liability is appropriate. Do not be misled, if I may ask you not to be. The dialogue between trial counsel Mr. Morris and Judge Mahan at the conclusion of the trial was directly in the context of this question that was asked. Against whom should the judgment be? Judge Mahan said, well, who is the successor? And Mr. Zell Morris said, Veston. In their 10-K filed with the SEC, they don't say that Veston succeeded in some of the mortgage liabilities of Delmar Mortgage. They say Veston is the successor. And Judge Mahan held in his ultimate findings that they were bound by their statements made to the SEC. Let me turn briefly to the issue of penalty. I ask Mr. Schustek, by the way, the appellants want to argue that this is a fee on money due or owing, and that those kinds of fees are valid under NRS 9905R. So let's see how Mr. Schustek himself characterized this penalty in his testimony. You only have a minute left. I understand, Your Honor. I said, you called it an incentive fee. By that, you mean that this was a real hammer. If Mr. Bullock didn't do what this agreement said, he was going to get hit for $10 million. Answer, yes. Question, and that's what you intended when you came up with the fourth deed of trust? Answer, no, I didn't intend to hit him with a hammer. What I wanted to do is him to stay to his word when he assured me he was going to do. So then I gave him another chance. Question, and if he didn't do it, you expected him to be hit hard. Correct answer, hit hard. Under their own characterization, this ---- But that counsel's position is that a penalty is permissible under Nevada law, under the statute. The Supreme Court of Nevada did not so hold in 1993. Nine years after 99050 was adopted in the Mason v. Fekinney case. Nor in Sanson Investment Company in 1996 years thereafter. Nor did Judge Reed so hold in the Hubbard case in 1986, two years after 99050 was adopted. And the South Dakota Supreme Court has found the doctrine of unlawful penalties alive and well in Chamberlain Livestock Option v. Penner. So given the fact this is a recurring issue of State law, why not certify that to the Nevada Supreme Court? You did certify that question to the Nevada Supreme Court in the Sanson case, Your Honors. And they came back and said it was an unlawful penalty in that case. The only answer appellants have to that is that the phrase 99050 doesn't appear in that case. Oh, it doesn't. The lawyers are too stupid to have raised it. The judges are too stupid to have recognized it. And therefore, this Court is not bound by those decisions. Those are the most recent authoritative pronouncements of the Nevada Supreme Court on this question. And I respectfully submit, Your Honors, that the Federal court is bound, as appellants have contended, by the controlling Nevada law. We respectfully submit that the judgment should be affirmed in all respects. The jurisdiction is clear. The penalty is invalid. And Veston is acknowledged by appellants on the record to be the successor, as Judge Mayhan found. Thank you, Justice. Let me begin just briefly on the rebuttal with the jurisdictional question. Judge Rastani correctly stated our position. It's that at whatever stage the district judge determines that this isn't a security, and as he ultimately determined that there was no purchaser or seller as a plaintiff, then there is no jurisdiction in this case. We believe the Court should have resolved that at the motion-to-dismiss stage or at the summary judgment stage. And the fact that the Court made that determination after the trial does not mean that the Court had Federal jurisdiction because of the timing of the Court's decision. And I think that the Jurisdiction. And it took a merits hearing to or trial to determine whether there was jurisdiction if the ultimate result is that there is no, a finding there is no jurisdiction. That's correct, Your Honor. That's correct. At any point, and is this Court aware, is aware that at any point during the case, even if no party has raised it on appeal in this Court, in the Supreme Court, it becomes clear that Federal law has not been implicated by the claim that the plaintiff does not have standing, which they do not have, there is no jurisdiction. And then as this Court held in the Herman family case, since there was no hook to begin with of Federal jurisdiction, there is no supplemental jurisdiction. And under Plaintiff's theory, as long as the plaintiffs were able to keep the issue in play, the jurisdictional question, whether it was a security, if they can obtain a ruling on the State law question, then it's okay. But that would exceed the power of the Court to rule in that way. His argument is that the district judge never found that there was no security, rather that any harm was harm to investors. He's saying, no, the harm we're claiming was the harm to us from this disguising of the intent to get this penalty, and there was a security, and nobody said there wasn't. It's just that he said that our claim wasn't any good. I think, you know, what the judge said was, and correctly so, on page 444, that he was unable to find any case in which the borrower in a commercial transaction like desert land, such as this one, was the plaintiff in a Federal securities claim, and so I think that claim properly belongs for the investors. And the instruments that the judge is talking about are the fractionalized interests that were sold separately by Veston. And the desert land wasn't an issue or the interests that were sold to the investors. Desert land's obligations and promises ran only to Veston, and that's at 19ER193 and then 21ER212-71. Those are the promissory notes and deeds of trust that run from desert land to Veston, and those are the only things that desert land issued. There was a ---- Well, I guess he wants to say it's all part of one transaction, a continuous transaction, that involves the security at the end, and that they were defrauded in connection with the issuance of the note to the lender. And I think, Your Honor, that is their theory, and I think it really defeats ---- it shows our claim is baseless. This Court in the Great Western Bank ruled that the subsequent or related transactions do not convert a loan transaction into a security. The Bass case from the Sixth Circuit that we have cited talked about the fact that a loan may not be a security, but maybe the subsequent participations might be. The Amfac case, again from this Court, held that the participations in the selling off of a loan might qualify as a security, but that the loan didn't. And the courts have drawn a very clear line between the borrower and then some subsequent person who sells the interest off from the loan. And there is not a document in these ---- in the entire record that suggests that desert land had any relationship with those investors. The sales were from Veston to the investors. And I don't even know if those qualify as securities. The Banco Espanol case from the Second Circuit rejected that argument. So I think, yes. Ginsburg. Assuming an arguendo, you lose and there is jurisdiction, should this be certified to the Nevada Supreme Court? Samson dealt with a different statute, the one on liquidation. That's correct, Your Honor. And I think the other case was on a trust situation, right? That's exactly right, Your Honor. The Nevada Supreme Court did not talk about this statute in any of those cases. This statute was not at issue. And if the Court were ---- felt that it needed guidance from the ---- as to what the statute was and thought about that statute and thought that there was jurisdiction, then I think that would be an alternative, because it really is a pure State law issue and we think the language of the statute is clear and that the jurisdiction or the legislative history is clear. But if there's doubt rather than try to divide it, if the Court feels it needs more information, I think that would be another way to go. When I read the findings and facts conclusions of law, it appears that the judge was saying he wasn't relying just on the statement about successor, but involving the whole ---- the whole record. And then, was the statement ---- was there a later statement by the judge after the motion for rear hearing that said he was basing it on the SEC statement? No, he never did, Your Honor. In fact, that is incorrect, because the SEC statement was never put before the judge. I'm glad you reminded me of that. The plaintiff contends that he expressly relied on the SEC statement. We put that in as part of our stay motion after the judgment had been entered. So the judge could not have expressly relied on that document. It wasn't part of the trial record. It wasn't part of the record before the judge when he entered the judgment. And it does ---- that statement in the SEC statement said ---- it does not say it was ---- it succeeded the company, as counsel just stated. It says it was a successor as to the mortgage business or something like that. But the record is clear, the testimony, that Del Mar Mortgage Inc. continued in existence and was still engaged in some form of the mortgage business. That's the record that was before the judge, and that's why we think successor liability was inappropriate. And finally, I just wanted to address this notion that Mr. Bullock was abused and coerced and there were no findings of duress. And again, on August 30, right after the August 24, 1999 agreement had been signed regarding the penalty, he wrote to Mr. Schustek and his staff saying they wanted to thank him for all their effort in getting the loan. They know no other private lender who could have funded the loan so quickly, and they thanked him for their vote of confidence. So we think the Court should reverse. Thank you. Thank you, counsel. Yes, I think we have that, but we haven't ruled on the motion yet. That's correct. I just wanted to make sure. I do have copies of that reply. Yes. No, I think we have it. I think we have it. You mean the sur-reply? No, that was a sur-reply on the merits. This is a reply brief on the subliminary. Oh, okay. And it's important because the facts about when the KBKSB was paid, was filed, are laid out very specifically in that reply. Well, we'll have all those documents before we act on anything. I just wanted to make sure. Thank you very much. Thank you. Thank you all. The Court will take a brief recess.
judges: Reinhardt, Thomas, Restani